Cleghorn et al. vs. Love.

CHARLES CLEGHORN, et al., plaintiffs in error, vs. WILLIAM E. LOVE, defendant in error.

[1.] It is competent for a Court of Chancery to adjust, in one suit, the rights of all parties who complain of the breach of a trust growing out of the same transaction, when an investigation of one involves an enquiry into the other.

[2.] If trustees to sell and pay debts, sell within a reasonable time for a fair value, and apply the proceeds faithfully to the payment of the debts. they have discharged the trust to that extent.

[3.] The sale of property of the same defendant is no evidence to prove the value of property of the same kind sold a month afterwards.

[4.] When three persons call another aside to speak to him, what one says in the presence and hearing of the others, is evidence against all.

Cleghorn et al. vs. Love.

[5.] To enable the Court to determine whether sayings of a person, proposed to be given in evidence, were properly admitted, the sayings must be set out in the record, and the same in respect to the parts of bill in answer proffered to be read.

[6.] Exceptions must be plainly and distinctly set forth in the record, or the Court cannot consider them.

[7.] Decretal verdict sufficiently certain when the Court can execute it.

[8.] New trial granted if the verdict of the jury be against the evidence.

[9.] Trustees cannot deal with each other in the trust property, and cannot sell to another any portion of the trust property without the assent of the *cestui que trust*, who must be competent to assent.

[10.] All debts embraced within a trust for payment of debts should be paid.

[11.] Trust for payment of husband's debts, surplus to wife, the surplus, if decreed to husband, should be in trust for the wife, and the wife ought to be a party.—McDONALD.

In Equity, in the Superior Court of Muscogee county. Tried May Term, 1857. Judge E. H. WORRILL presiding.

William E. Love filed his bill to the November Term, 1853, of said Court, against Cleghorn, and Mrs. McDougald, the administratrix of Daniel McDougald, alleging that on the 1st Tuesday in May, 1849, certain negroes of complainants, 17 in number, were sold by the Sheriff under *fi. fas.*, but these *fi. fas.* amounted to less than the value of the negroes; that Daniel McDougald, confederating and combining with Cleghorn to purchase the property for less than its value, represented to the persons who were at said sale for the purpose of bidding for the slaves, that they were bidding for the slaves for the benefit of complainant and his family; that their purpose was to bid off the same, sell enough to pay Love's debts, and give the remainder to Love, or settle it on his family; that in consequence thereof, the persons present declined to bid, and the negroes were knocked off to McDougald and Cleghorn at a nominal sum; that at the time of the sale Love was absent from the State, but on his return was informed of the above, and not doubting the sincerity of the parties, did not immediately call on them to redeem their promises; that several times in 1852 and 1853 he, Love,

conversed with Cleghorn, (McDougald being dead,) in relation to the matter, and he always admitted the facts as stated above, and promised to carry out the said arrangement; that in the early part of the year 1852, he called on Cleghorn for one of the negroes for a nurse, and was put off; but that in May, 1853, he demanded a portion of the negroes, when Cleghorn refused, and denied his (Love's) right to any of them; that he has sold some of the negroes, holds the others and claims them; that the negroes, at the sale, were worth fifteen thousand dollars, which was enough to pay the debts and leave a balance of eight thousand dollars.

The prayer of the bill was that the sale be declared fraudulent; that defendants be declared trustees for Love; that an account be taken, and for general relief.

The defendant, Cleghorn, by his answer admitted the sale, but denied being present at the sale, or that there was any combination or agreement with McDougald, or that he was represented by an agent; that he never bid or authorized any one to bid for him. Says his information is, that McDougald did not bid, but that Robt. B. Alexander bid off and took possession of said slaves.

He says the negroes were of bad character, and the title was in doubt, it being thought they had been fraudulently conveyed to Love, by his father-in-law, James S. Calhoun; that the negroes were liable to a *fi. fa.* controlled by Dr. Boswell vs. Calhoun, which was levied on them.

He denies that he ever made any arrangement with McDougald or any one else, to purchase said property, but says he is informed that Robt. B. Alexander, as agent for Love and Calhoun, did bid it off to re-sell and, if possible, pay the debts of Love and Calhoun; that Alexander sold to defendant, and defendant to Daniel Griffin, nine of said negroes at $2,100, their value; that on the day of the purchase of the negroes by Alexander, he, Alexander, gave defendant an order to the Sheriff to make defendant titles to the negroes pur-

Cleghorn et al. vs. Love.

chased by him, Alexander, meaning the remainder not before that time sold by Alexander, and that his bill of sale from the Sheriff was made in pursuance of said order; that at the same time, in compliance with the request of Alexander, who was in feeble health, he also took the title to Louisa and her children; that he has never had any interest in these negroes, but did this for the accommodation of Alexander; that Alexander sold Louisa and her children to Dr. Billing for $1,500, and this defendant executed the title to Billing; that all this was done as the friend and agent of Alexander.

He denies all combination, and denies any admissions as charged in the bill, or that he was present at the sale.

*Mrs. McDougald*, administratrix, answering, says the negroes were Calhoun's and not Love's; admits they were levied on as Love's, and says they were also levied on as Calhoun's; she denies that Daniel McDougald had anything whatever to do with said slaves, or combined with any one, or made any representations, or purchased any of said slaves; denies, on information, that bidding was suppressed, or was merely nominal; says that Alexander bid them off as agent of Calhoun, to pay certain confidential debts, and answers in substance what Cleghorn did.

The defendants amended their answer, setting up the agreement between Alexander, Love and Calhoun, and allege the sale by Alexander of one slave to Mrs. Sankey, one to D. Griffin, four to Dr. Billing, one to Dr. Boswell, five to Cleghorn, and four to D. Griffin; for all of which Alexander received in payment debts of Love, and of Calhoun; that Cleghorn has paid about $2,700 of the debts of Love, specifying the debts paid; that they are informed Love consented to the arrangement and ratified it, and again say what he, Cleghorn, did in the matter, was as agent and friend of Alexander. They say that Alexander and McDougald were solicited by Calhoun to purchase said negroes and prevent a sacrifice, and to re-sel at private sale—which was without consideration; that large

sums of money have been paid out by Cleghorn, as the agent of Alexander, in paying the debts of Love and Calhoun; that this was done with the consent of Love; and that McDougald took no part in the sale of said negroes; and they plead the statute of limitations of four years.

Upon a general replication filed, the parties went to trial, and the complainant introduced the following testimony:

*John H. Davis* swore that about the 15th of April, 1849, just before Calhoun and Love left for Mexico, Love, Cleghorn and witness met in a room in the Oglethorpe House, to see what amicable arrangement could be made, if any, in regard to the sale of the property of Love advertised, for the purpose of saving something for Col. Calhoun's family; that witness met at the instance of Calhoun; that it was suggested by some one that they go to see Daniel McDougald; that they went out to find him, but did not do so.

*Adolphus S. Rutherford* swore that on the first Tuesday in May, 1849, as Sheriff, under *fi. fas.* in favor of John L. Mustian and others, he sold, as the property of Love, 18 negroes, which were bid off by R. B. Alexander, at the aggregate price of $3,830; that it was announced by Alexander that an arrangement had been made by which the property of Love was to be bought in and sold at private sale, to pay the debts of Love, and see if something could not be saved for Mr. Calhoun's daughter; that the purchase money was not paid, and he received no money except $260 on a *fi. fa.*, and $268 costs on the *fi. fa.*, which Cleghorn paid him; that he sold on the same day, city lots 35, 36, 37 and 38, as the property of Love, which were bid off by Alexander at $150, and no money was paid; that it all seemed to be understood, and the attorneys for the plaintiff in *fi. fas.* made the settlements themselves; that on the Tuesday in April previous, he sold, as the property of Love, under a *fi. fa.*, nine negroes for $4,393; that he received no money at this sale; the matter was ar-

ranged between the parties; McDougald and Alexander were at the sale in May; Calhoun and Love were not; don't recollect as to Cleghorn. He proved the first three exhibits to the brief.

*Joseph L. Lee* swore he was at the sale in May; that just before the negroes were put up, McDougald, Alexander and Cleghorn took him off, and Alexander, in presence of the other two, told him they had made an arrangement to bid off the property, and were to sell the same again at private sale, and pay the debts of Love, and see if they could not save something for Calhoun's daughter. McDougald and Cleghorn said nothing, but were near enough to hear; that Alexander asked him not to bid, and he did not do so; the negroes were put up, and the above announcement made publicly by McDougald and Alexander. He proved the value of the slaves at the sale to be $5,350; the value now to be $9,400, and their average annual value $665; that before the sale, McDougald or Alexander requested him to get a statement of the judgments and executions against Love, and he found in office, *fi. fas.* against Love, to the amount of $9,346 21; that this included the *fi. fa.* of Mustian; and after allowing thereon the credit of the April sales, there were *fi. fas.* againt Love to the amount of $5,177; that Love married a daughter of Calhoun, who originally owned the slaves and the lots; that Calhoun and Love lived together.

*John L. Mustian* testified he was at the April sale, and bought the negroes sold for $4,370; that he paid no money, but had the oldest *fi. fa.*, and credited it with that amount; that his *fi. fa.* was between eight and nine thousand dollars; that after the April sale he, Alexander and McDougald met in Holt's office, when it was agreed that Griffin was to purchase the city lots at five thousand dollars, their value, and he, Mustian, was to take the notes of Griffin for the balance due on his *fi. fa.*; that he was at the sale in May, 1849, when McDougald, Cleghorn and Alexander being present made the statement specified by Lee, except that Louisa and

her three children were to be saved for Mr. Calhoun; that the agreement* about the Griffin notes not having been consummated, witness bid for the negroes, and run them up to enough to pay his *fi. fa.* He took the notes of Griffin for the balance due him from Love; he testified the same as Lee about the value of the negroes.

*I. A. Brokaw* swore that after the sale, he sued Love and garnisheed Cleghorn, and afterwards met Cleghorn, who offered to buy his claim; witness refused to sell the claim at a discount, or to dismiss his garnishment; Cleghorn asked to let him have the note on Love, and he would see what he could do with it; he, in a short while returned, and told witness his claim was not old enough, but if he would date it back, he would be able to use it, and would take it; witness refused; Cleghorn pressed him to dismiss the garnishment; witness refused, and Cleghorn replied, " I dont care; I'll be damned if I dont swear out;" witness has a claim against Love, and expects, if Love recovers, to get his debt.

*Joseph Kyle* was at the sale to buy the boy Richard; the statement was made that the negroes were to be bid off for the benefit of Calhoun and Love; he was requested and did not bid; that afterwards he met Alexander and McDougald; they offered to sell Richard, and he agreed to buy him at $700; that he had a small claim on Love, which they agreed to take in part payment, but Richard not wanting to live with him, he did not take him.

Complainant closed, and defendants introduced the following testimony:

*Mrs. Sankey*, who swore that the bill of sale to the boy Joe, was made to her by the Sheriff, and that the consideration she gave was two notes on her brother, Love, for about $900.

*Dr. Billing* swore that in 1849, he bought Louisa and three children of Alexander; that he made the trade with Alexander; that Love and Calhoun owed him $1,044; that he gave this debt and $500 for said negroes; that they were not

worth more than $1,200; that Boswell had a claim on Cal-
houn, and by agreement, he paid the $500 to Boswell; that
before Love left for Mexico, in the month of April,· 1849,
he had some conversation· with him about his claims,
when Love told him Alexander would arrange them; and
that after Love returned, he ' told him of the arrange-
ment he made with Alexander, his purchase of the ne-
groes, how he paid for them, also of the payment of $500·
to Boswell, and that Boswell had taken the boy Floyd at
$700, in payment of the balance of said debt, and all he had
heard of the disposition of the property by Alexander, and
Love said it was all right, and expressed his satisfaction at
what had been done; that he told him how the sale in May
had been conducted; that Boswell controlled the Foster *fi.
fa.*, and he paid Boswell by order of Alexander.

*Dr. Boswell* swore he was an endorser on the *fi. fa.* of Fos-
ter vs. Calhoun and others, and as endorser, paid $2,500, and
got a transfer thereof; that he took in payment of the *fi
fa.* Floyd and $500; that this agreement was made with
Alexander, and Boswell paid him the money by Alexander's
order; that this *fi. fa.* had been levied on the property as
Calhoun's, and was advertised; that it was agreed by him and
Calhoun that he was to have on his *fi. fa.* $1,200 out of the
May sales.

*A. K. Ayer* swore to the market value of Polly and her
children, and Aggy and her children, and thinks their mark-
et value to have been about $2,100; that he was a dealer in
slaves.

Cleghorn then proved the payment by him of the debts of
Love to the amount of about $2,000, shortly after the sale in
May.

*Seaborn Jones* proved that Love never owned the negroes,
but that they belonged to Calhoun.

Defendants then read in evidence the originals of all the
papers alluded to, and closed.

The Court charged the jury, and they returned a verdict for complainant for $4,954 28, and that the executions, notes and account offered by defendants as vouchers, except the amount paid on the Foster *fi. fa.*, be satisfied.

At that Term of the Court the defendants moved for a new trial on the following grounds:

1st. Because the Court refused to dismiss the blll at the hearing.

2d. Because the Court erred in admitting the evidence of Lee, Rutherford and Mustian, to prove the value of the negres now, and their value for hire.

3d. Because the Court admitted the evidence of Rutherford, of the sale in April, 1849.

4th. Because the Court admitted the evidence of Rutherford, as to the sale of the city lots.

5th. Because the Court erred in admitting the evidence of Lee, as to what Alexander told him at the market house.

6th. Because the Court refused to allow defendant to prove what Alexander said when he sold the negroes to Billing.

7th. Because the Court refused to allow defendant to read in evidence certain parts of complainant's bill.

8th. Because the Court refused to allow defendants to read as evidence certain portions of their answers.

9th. Because the jury found contrary to the charge of the Court—the Court charging them as follows:

*Gentlemen of the Jury:*—The complainant charges, that on the 1st Tuesday in May, 1849, seventeen of his negroes were seized by the Sheriff and sold under executions against him; that McDougald, Alexander and Cleghorn were present at said sale, and represented that they wanted to buy said negroes as low as they could, and then sell them at private sale and pay complainant's debts, and the remainder, if any left, turn over to complainant, prevented bidding, at said sale, and the consequence was, his property was sold below its value.

Complainant contends that he should recover of defend-

Cleghorn et al. vs. Love.

ants, because McDougald, Alexander and Cleghorn agreed to bid off his property at Sheriff's sale, sell it at private sale, pay his debts, and turn over the balance to him; that they did bid off 17 negroes at the nominal sum of $3,330, but paid no money; and that there is now in the hands of Cleghorn, a large amount of property unaccounted for, after the payment of some of his debts.

If you believe McDougald, Alexander and Cleghorn attended the Sheriff's sale, and prevented competition in bidding by the bystanders, by any act of theirs, any representation of theirs, and furthermore, if you believe they did thus purchase the complainant's property for less than it was worth in the market, and that the complainant did not authorize them to do this, then it was a fraud on the rights of Love, and Cleghorn is liable for the present value of the property so purchased and bid for, from said sale until the present time. Again, if you believe it was not as I last stated, but that there was an agreement between Love, McDougald, Alexander and Cleghorn, that they should attend the sale and purchase the property of complainant, and then sell it to the best advantage at private sale, and with the proceeds pay complainant's debts, and if any remained after paying his debts, to hand him, complainant, over the balance, and that McDougald, and Cleghorn did attend said sale, bid off the property, and paid the debts of complainant, or any of his debts, then Cleghorn is entitled to a credit for whatever amount of debts of Love he thus paid, and if any sum was left over in his hands, that sum the complainant is entitled to at the hands of the defendant, Cleghorn. The defendant contends that amongst the claims he thus paid off, was an execution against James S. Calhoun, and that he is entitled to a credit for the sum of $1,200 which he paid for that execution. Now, gentlemen, that depends upon the fact whether or not the complainant authorized the defendant to pay a debt of Calhoun with the proceeds of complainant's property. If the property was complainant's, and he did not authorize the defendant, Cleg-

horn, to pay Calhoun's debts, the defendant is not entitled to a credit for this amount.

Defendant contends that in carrying out the objects of McDougald and Alexander, he has paid off a large amount of executions, notes and accounts against complainant; complainant contends they are not paid; instead of that, the defendant, Cleghorn, has taken to himself transfers of the executions, and left the notes uncancelled, and the accounts open against him. If you believe he did receive property of complainant, to sell and apply the proceeds to the payment of Love's debts, and then took transfers of executions against Love to himself, bought notes against complainant and left them uncancelled, and accounts against complainant and left them open, defendant is not entitled to a credit for such executions, notes and accounts thus in his hands.

It is conceded on the part of the complainant, that some of executions, notes and accounts defendant says he has paid off, are paid; for them you will give defendant credit in making your verdict. Defendant, Cleghorn, contends that if he did agree, as alleged in complainant's bill, and if he did receive complainant's property to sell and apply the proceeds to the payment of complainant's debts, that the property so received did not belong to the complainant, and he is not compelled to account for the same. If you so believe the complainant is not entitled to recover of the defendant.

If you believe under an agreement between McDougald, Alexander and Cleghorn, and Love, the complainant, that the property was purchased below its value, by acts of McDougald, Alexander and Cleghorn, bidding was prevented, the complainant cannot recover.

If you believe McDougald, Alexander and Cleghorn attended the sale, and prevented competition in bidding for said property, and that they purchased it for nothing almost, without any privity, on the part of complainant, yet if complainant afterwards ratified the purchase, and expressed himself satified with it, then the complainant cannot recover, but

still the complainant must have ratified the purchase with a full knowledge of all the facts of the case, to make it binding upon him. The defendant pleads the statute of limitations of four years in bar, of complainants right to recover. If McDougald, Alexander and Cleghorn, attended the sale and by acts of theirs prevented competition in bidding, and the complainant was privy to all their acts, Love the complainant should have instituted his suit within four years, from the time of the purchase, but it is unnecessary to consider this charge because if the complainant was privy to their acts, he is barred a recovery. If the purchase was made under an agreement between McDougald, Alexander and Cleghorn, and Love, that they were to sell again and apply the proceeds, to the payment of Love's debts, and turn over the balance to Love, this was an express trust on the part of McDougald, Alexander and Cleghorn, and the plea of the statute of limitations of four years will not bar Love's recovery, unless defendant Cleghorn, more than four years before the institution of this suit, claimed the trust property adversely, denied the trust, and the complainant had knowledge of this fact. If Cleghorn received the property of the complainant under an agreement to sell the same and apply the proceeds thereof to the payment of complainant's debts and turn over what remained afterward into the hands of complainant, you must give defendant a reasonable time to execute said agreement, and then from that time you must allow complainant interest and whatever sums remained in defendant's hands, if any, as well as that sum itself.

If you believe Cleghorn, in carrying out the objects of McDougald, Alexander and Cleghorn, did receive property of complainant's, and sell the same, and did take transfers of executions to himself and paying the money for the same, and buying up notes on complainant, left them uncancelled, and bought accounts against complainant, and left them open, the Jury may decree that Cleghorn the defendant shall satisfy said executions, notes and accounts, in any given time within

a short time, say ten or fifteen days, and then give defendant credit for the same in finding their verdict.

10th. Because the Court erred in its charge as set out above.

11th. Because the verdict is void for uncertainty.

12th. Because the Jury found contrary to the evidence.

13th. Because the verdict is against the weight of evidence.

14th. Because the verdict is against each of defendants, and there is no evidence against McDougald.

15th. Because the Jury refused and failed to allow the payment made to Boswell on the Foster *fi. fa.* as a credit.

16th. Because the Court refused to charge the Jury at defendant's request, that if they believe from the evidence that the arrangement was, that the defendants and Alexander were to bid in the property at the May sale, and resell the same at private sale and pay the debts of Love, and try and save something for Calhoun or Calhoun's daughter, and that Love assented to or ratified this, that then Love is not entitled to recover the balance after paying his debts.

The Court granted a *rule nisi :* but refused to make the same absolute, and refused the motion for a new trial, on all the grounds specified, and the defendants excepted.

JONES & JONES; and WELLBORN, JOHNSON & SLOAN, for plaintiff in error.

W. DOUGHERTY; and HINES HOLT, for defendant in error.

*By the Court.*—McDONALD, J. delivering the opinion.

This litigation concerns the negroes sold at the May Sheriff's sale, 1849, and charges a fraud in the purchase, by the repression of competition, under the pretence, by the purchasers, that they intended to buy them in, for the benefit of the debtor and his family—by selling the property at private sale to the best advantage, pay the debts of the defendant in execution, and save something if possible for his wife. The bill

Cleghorn et al. vs. Love.

proposes to hold them to the trust, and to compel them to execute it.

The arrangement to make this purchase, if made in the first instance, in good faith, as it probably was, was made, as it would seem, from some of the evidence, with the privity of the complainant, but he was absent from the sale, having left the State before that time.

According to the allegations in the bill and the proofs at the hearing, the conduct and declarations of the three persons concerned in the purchase, Alexander, McDougald and Cleghorn, they having become the purchasers of the negroes, though they were bid off by one of them, created a trust in them for Love's creditors and his wife. The circumstances show that the creditors were apprized of the transaction, for the money was not paid to the Sheriff and we hear no complaint from them. Indeed there is positive proof from one of them, Mustain, that he was privy to it. The negroes were purchased for much less them the amount of the execution debts of the defendant, although their value exceeded it considerably. The complainant was not without interest in this matter, although the trust was for the benefit of the creditors and the wife of complainant, for if not carried out as promulgated at the sale, his debts would be left unpaid, and he subjected to harassment by his creditors. The object of the bill was to bring the parties sued before the Court for an account of the whole matter.

[1.] At the hearing, it seems from one of the grounds in the motion for a new trial and the opinion of the Court delivered thereon, though it does not appear elsewhere in the record, that a motion was made to dismiss the bill, because it states conflicting equities. It is one of the maxims of a Court of Equity that it will not do justice by halves, and what constitutes its chief value is, that it can bring before it all parties engaged in a transaction, and however diversified their interests and liabilities may be, it can frame a decree giving each complainant his right, and holding each defendant

to his proper accountability.    I am not to be understood as intimating that different subjects matter may be united in one bill against the same defendant; or that very dissimilar matters growing out of the same transaction, against several defendants, may be joined in the same bill.

But, when investigating one of several branches of a case growing out of the same transaction, the others are to some extent involved, they should all be inquired into in one suit. To illustrate by this—if the defendants instead of paying the debts of the complainant, take an assignment of them, when paid from the proceeds of the sale of the property purchased at the Sheriff's sale, neither the creditors nor the wife, are injured by that transaction, the creditors are paid, but the wife is injured by their refusing afterwards to pay over to, or settle on her, the surplus of the proceeds after purshasing up the debts.  If those things be done they are breaches of the same trust, and the inquiry into one brings before the Court, the violation of the other, for the wife is entitled to the surplus after paying the debts, and the amount of debts paid, or to be paid, must be ascertained.    It is, therefore, competent for the Court, in a single suit, to adjust the rights of all the parties who complain of breaches of trust growing out of the same transaction, when an investigation of one involves an inquiry into the other.

[2] If the defendants, or either of them sold the negroes, at any reasonable time after the purchase, by which I mean, allowing time to find a purchaser, the first issue to be tried, is whether the sale was free from fraud and for a fair value, and the proceeds faithfully applied to the debts, if so the trust is so far executed; if not, and the sale was fraudulently made for less than the value of the property, but the proceeds were applied to the debts, then the dedendants are accountable for the difference between the full value the time and the price at which they were sold and interest on that difference.

[3] The sale of  negroes in April had no connection with

the sale in May. The record exhibits nothing to show that that evidence was properly admitted. The price for which they sold is no evidence of the value of negroes sold a month afterwards. The difference may have been in the value of the negroes. It does not appear that the defendants pretended to set up that debts paid by the April sales, were paid by the proceeds of sales in May.

So in regard to the sale of the city lots. The debt paid by that sale was not produced as a debt paid by the sale of the negroes.

[4] Lee's testimony as to what Alexander told him at the market house was properly admitted. He says the three purchasers took him aside, and what the one who spoke said was in the presence and hearing of the others.

[5] This Court cannot determine whether what Alexander said, when he sold the negroes to Billing, was properly admitted, or not, as it does not appear in the record, but if what he said, was said while doing an act in execution of the trust, it was properly admitted.

The parts of the bill and answer proposed to be read in evidence to the Jury are not set forth in the record, and this Court cannot therefore determine whether they were properly ruled out or not.

We are not prepared to say that the verdict of the Jury is not in conformity to some one of the aspects of the case presented to them by the Court in its charge.

[6] The plaintiff in error sets forth a long charge of the Court, presenting the case in many different views and there is a general exception to the entire charge. The exceptions must be plainly and distinctly set forth, or the Court cannot notice them. *Acts of* 1855–6, *p.* 201.

[7] The verdict is sufficiently certain to ascertain the subjects on which it is to operate, and to enable the Court to cause the decree to be executed.

[8] The verdict of the jury is, we think, against the weight of evidence under the law, applicable to facts in proof. It

appears from the evidence that many of the negroes were sold shortly after the purchase, principally in payment of the debts and, according to the witnesses of complainant, they sold for their value, or so near it, that the difference furnishes no evidence of fraud in those sales.  Those debts according to the the terms of the trust became extinguished as debts of Love ; but for the trustee to take an assignment of them, and keep them open is a fraud, he may be compelled, as the Jury have required him to do, to satisfy the whole of them, whether they be due by judgments, executions, notes or open accounts. If the property was fairly sold, and the debts embraced within the trust paid, there is nothing to complain of in a Court of Chancery.  But it appears that negro woman Polly and her children are still in the possession of defendant Cleghorn. He claims to have purchased them of one of his co-trustees· Dealing of that sort among the trustees themselves in respect to the trust property, without the assent of a *cestui que trust*, competent to assent, are void.  They. cannot be supported. The defendant Cleghorn is accountable for the present value of Polly and her children, and their descendants if any, together with their hire.  If the proceeds of the sale of other trust property are not sufficient to reimburse him for all the debts of Love which he has paid, the proceeds to be considered as having been applied at the time they were received, or ought to have been received, then .he is entitled to be allowed any unpaid balance with interest from that time to the time of trial, or at which the value of Polly and her children is estimated.

The verdict is larger than an account thus taken would warrant.  If it had been increased by an allowance to the complainant of the reasonable expenses of prosecuting the case, it would still be too large.  This being the case of a trustee refusing to account when an account was demanded, and he offered no reasonable excuse for not accounting, such allowance might, perhaps, have been made, but there is noth-

Cleghorn et al. vs. Love.

ing in the pleadings or evidence which shows that the verdict was at all increased by such allowance.

[9] The trustees are all liable. They are co-trustees, and it is the duty of each one to look after the trust property and to see that there is no misappropriation of it by a co-trustee. This is the general rule, and there is nothing in the record to take this case out of. its operation. Perhaps if one trustee committed the beach of trust on which the account is decreed, the Court might so mould its proceedings as to require the guilty party to respond first. I do not say it would do it. It certainly would not if the *cestui que trust* is to be delayed by it. The verdict against all is right.

[10.] Whether the Jury was right in refusing to allow the payment to Boswell, we have perhaps substantially decided in that part of the decision wherein we have said that the verdict of the Jury is against the weight of evidence. If the debt was embraced within the trust, it was right to pay it. From the evidence of Dr. Billing, Love had said to him previous to the sale, and before he left for Mexico, that Alexander would arrange his claims, and that after his return he informed him how it had been done and of the payment to Boswell, and he said it was all right. The inference is pretty strong that Alexander was the agent of Love in this business, and that he sanctioned on his return what he had done in respect to the payment of Dr. Boswell's debt. There may have been good reasons for it, for Dr. Boswell had had some of the same property levied on as Calhoun's, and that levy had been dimissed on an understanding between them, (Calhoun and Boswell) that his claims should be paid from the proceeds of the May sales. Calhoun, it is true, had no power to bind Love or his property to that engagement, but Love's subsequent assent to the doing of the very thing by his own agent, is strong evidence that it was done by his authority, and upon a motive sufficiently strong to amount to a consideration. He might have been desirous of avoiding a contest with Calhoun's creditors in respect to the property.

[11] The request of the defendants counsel to the Court to charge the Jury as set forth in the 16th ground in the motion for a new trial, was not, as a whole, warranted by the evidence in the case, but I am of opinion that the trust is a valid one for Mrs. Love and that she, through her next friend, can enforce it, and that, properly, she ought to have been made a party complainant to the bill. If a dcree be rendered for the complainant, it ought to be in trust for his wife. If there be any creditors of Love unprovided for, if existing at the time of the Sheriff's sale, and not paid, nor any parties to this bill, there is nothing to pervent their being heard against the settlement.